Pearson, J.
The question presented by the case will be considered under three heads. Does the charter authorise the bank to issue one dollar notes for circulation “ as the representative of, or as a substitute for, money” ? Had the Legislature power to prohibit the circulation of such notes? "Was it the intention of the Legislature, by the 36th chapter Eev. Code, title “ Currency,” to exercise this power in regard to the notes of the Bank of Fayetteville ?
1. There is no clause in the charter which, in so many words, authorises the bank to issue notes for circulation as money; the charter confers banking powers in general terms. *454 In one clause “ bills or notes,” issued by order of the corporation, promising to pay money to any person or to bearer, are mentioned. In another clause the bank is required to furnish the public treasurer, once in six months, with a statement of the cash on hand, “ notes in circulation,” &c. All the bank charters in this State are worded in much the same way. The charter of the bank of the United States, obviously, was the original from which all the charters are directly or indirectly taken, and in none is the power to issue notés for circulation given in terms any more direct. So there can be no doubt that the charter does confer the power to issue notes for circulation as money. As' the act of 1816 (Rev. Stat., ch. 34, sec. 90,) prohibits any person or corporation from issuing “ notes, commonly called bank notes, of any value, with intention that the same shall circulate as money, without the authority of the Legislature first had,” it is somewhat strange that the draughtsmen of these several charters were content to leave the aiithority dependent upon general terms. The omission to give the power, in totidem verbis, can only be accounted for by the circumstance alluded to : having a form they did not like to depart from it.
The power to issue notes for circulation is not restricted by the charter under consideration; it embraces notes of all denominations—under, as well as over, one dollar. But it is clear the charter must be construed with reference to the existing laws. The act of 1816 (Rev. St., ch. 34, sec. 86.) prohibits any person or corporation from issuing promissory notes, called due bills, (under one dollar,) for circulation as money, and it is agreed the power is restricted by this act so as to exclude the right to issue due bills.
It is insisted that the act of 1830 (Rev. St., ch. 11, sec. 1,) has a similar effect, and restricts the power so as to exclude the right to issue bank notes under five dollars. On the other hand, it is insisted that the act of 1830 applies only to the notes of the banks of other States. So the question is, did that act apply to the notes of the bank of this State? We think it did not. It enacts: “ It shall not be lawful for any *455 person to pass, circulate, or receive in payment, within this State, any bank notes under the denomination of five dollars, issued by any State or sovereignty, or by any body politic or corporate not authorised to issue the same by any of the laws or statutes of this State.” These words are satisfied by giving them the effect of prohibiting the circulation of the small notes of the banks of other States. The two principle banks in this State were authorized by law to issue notes under five dollars. So the circulation of their notes is expressly taken out of the prohibition, and there is but little ground to support the suggestion that this was a prospective general enactment aimed at banks that might at some future time be chartered in this State, and might, as it was feared, issue such bills, although not authorised so to do. Again, if it was intended to apply to the notes of our banks, it is reasonable to suppose that it would have contained a prohibition against the issuing of such bills. The act of of 1816 has two sections, one against the issuing, and the other against passing or receiving due bills. The act of 1854 (E. Code) by one section prohibits the issuing, and by another, the circulation of notes under three dollars ; and the omission in the act of 1830 of an enactment against the issuing of notes under five dollars, tends to show that it was aimed exclusively at the banks of other States, over whose power to issue, our Legislature could assume no control. But all ground to support the suggestion of a prospective general enactment, above referred to, is taken away by the fact that the title of the act of 1830 is “ An act to prohibit the circulation in this State, after the time therein mentioned, of bank notes under fixe dollars, issued by the banks of other States.” The title of a statute may be invoked in aid of its construction. Rex v. Cartwright, 4 T. R. 490; Dwarriss on Statutes, 18. It is true, in the Eevised Statutes, the title is changed and general words are used—“ An act to prohibit the circulation of bank notes under the denomination of five dollars.” But the ehange in the title of an act, in making a revisal, is not permitted to alter the construction which was before proper, when the same words were used in the enact *456 ment, unless the title had been allowed the effect of altering what would otherwise have been the construction. Terry v. Foster, 1 Mass. R. 150. Here, as we have seen, the construction, confining it to the notes of the banks of other States, does not depend simply upon the title. But suppose that it be yielded that this change in the title was made to allow the general words used to have application to banks in this State, if any should ever issue notes in violation of their charter, so that the act of 1816 fixes a penalty for issuing notes without authority, and this act prohibits their circulation, still that would leave the question open in regard to the authority to issue under any particular charter; which is the question now under consideration.
It was further insisted, although the act of 1830 may not of itself be sufficient to restrict this charter, yet it has that effect, when taken in connection with the fact that the several acts incorporating the other banks, all contain a provision making it unlawful to issue small notes ; thus showing the settled policy to be, to prevent the issue and circulation of such notes, so as to drive them out and make room for a metallic basis. We are asked, can it be possible that the Legislature intended to abandon this favored policy, and to confer, at the expense of the public, a special privilege upon the bank of Fayetteville, in which our other banks were not at liberty to participate ? Is such a construction of this charter reasonable % We have given to this suggestion much consideration. A difficulty presents itself at the outset. The act of 1830, and the charter of the bank of NewBern, exclude all notes under five dollars: the charter of the bank of the State and the bank of Cape Fear exclude only notes under three dollars. This creates uncertainty in regard to this “ settled policy,” and in attempting, by inference from these Statutes, to impose a restriction upon the bank of Fayetteville, it would be found impossible to decide whether the limit should be fixed at five or three. But we have come to the conclusion that the only legitimate effect to which this argument is entitled, is to prove that, in all probability, the omission of a proviso as to issuing *457 small notes, similar to that inserted in the charters of the other banks, was an oversight; in other words, the Legislature, from mere 'inadvertence, forgot to insert it. If we were at liberty to make this supposition, the evil is beyond our control ; for most certainly this Court has no power to supply the omissions or to correct the mistakes of the Legislature. Indeed, the omission of this proviso in its bearing upon the argument leans the other way, and tends to show that the authority is conferred; for, if its insertion was necessary to restrain the other banks, it follows that, without it, the power is given. In our case the same general terms are used, without this restriction. For these reasons, we are of opinion that the charter does confer upon the bank authority to issue one dollar notes.
2. It was assumed in the argument, that the Legislature had not the power to prohibit the circulation of small notes unless it had the power to revoke directly the authority to issue them, upon the ground that to prevent their circulation would necessarily prevent their issue, and that cannot be done indirectly which cannot be done directly; so, the two powers were treated as being precisely one and the same thing. We are not prepared to admit the position in the broad sense in which it was used. One may go around a hill and get on top of it, although he is not able to climb directly up. Many who deny that Congress has the power to protect manufactures by an act passed directly for that purpose, are forced to admit the power to give incidental protection by a tariff for revenue. So there may be a distinction; but we are not disposed to press it, except to the extent of claiming this reasonable concession: the object of the Legislature was to prevent the circulation of small notes, and the revocation of the authority to issue was necessary to effect that purpose.
So, a fair statement of the question is, had the Legislature, for the purpose of preventing the circulation of small notes, power to revoke the authority of the bank to issue them ?
Political and other considerations are apt to connect themselves with the subject of corporations, and thereby give to *458 it more importance than it deserves as a dry question of law 5 and the unusual amount of labor and learning bestowed on it, has tendedlo mystify rather than elucidate the the subject. In Meares v. the Com. of Wilmington, 9 Ire. 78, it is said, “ the idea that corporations are less accessible and less responsible to actions than individuals, (which, by the bye, was one reason why corporations have always been looked upon by the public with so much jealousy and so little favor,) has yielded to common sense, and it is now settled that corporations are as liable as individuals to be sued in contract or in tort, or to be indicted.” In Bank of the State v. Bank of Cape Fear, 13 Ire. 80, it is said, “ The Court supposes it to be clear that a corporation, is, like an individual, bound by, and may take benefit of, the general laws, where it is within the reason of them, unless there bo particular modifications in the charter.” The notion that a corporation is above the law has no ground to support it; the creature cannot be above the maker. Indeed, it is conceded that corporations and individuals stand on the same footing; both are equally subject to the laws, unless exempted from their operation by the force of a contract, and both equally have a right to protection. Stammire v. Weleh, ante, 214, is an instance where an individual was protected from the operation of a statute on the ground of his contract. The land of a corporation maybe taken for public use under the right of eminent domain, in the same manner as the land of an individual may be taken. West Riv. Bridge Co. v. Dix, 6 Howard, 507. These positions have been stated to clear the way and present th,e naked question—is authority to issue small notes conferred by the charter, as a part of the essence of the contract, with the-intention to put it beyond the control of all future legislation. ? —or, is it conferred as a mere incident, with the intention that it should be subject to such limitation as the Legislature might at any time thereafter deem expedient to make for the purpose of regulating the currency of the State ? This is a mere question of construction and a plain statement seems sufficient to dispose of it. With the exception of the powers *459 surrendered to the United States, each State is absolutety sovereign. With the exception of the restraints imposed by the Constitution of the State and the Bill of Eights, all legislative power is vested in the General Assembly. It is consequently unreasonable to suppose that the General Assembly, admitting it has the power, would alien or surrender and make subject to any individual or corporation, a portion of its sovereignty, and thereby disqualify itself from doing that for which these ample powers are conferred on it. As is said in McRee v. Wil. R. R Co., 2 Jones’ R. 189, “ wo should hesitate long before bringing our minds to the conclusion it was tire intention of the Legislature to take from itself the power of doing that for which all governments are organised—-promoting the general welfare, by adopting such measures as a new state of things might make necessary for the benefit of the public; in other words, it is unreasonable to suppose an intention to surrender the means by which it may thereafter be able to effect the purpose for which it was erected and formed into a government.” It follows, that to establish a contract on the part of the Legislature to relinquish any of its powers, plain and unequivocal words must be used. Eor instance, if its charter authorises a bank to lend money, and is silent as to the rate of interest, the general law will fix it; and should the Legislature afterwards make the rate lower, the corporation as well as individuals will b.e bound. So, if a rail-road company is authorised to carry passengers and freight, the Legislature may afterwards regulate the speed at which the cars shall run, or may make it unlawful to carry gun-powder on the same train with passenger cars; the sovereign being presumed to reserve to itself the regulation of all such matters, in the absence of an express contract to the contrary. In looking over the statute by which this bank is incorporated, we find authority to issue notes given in general terms; and although it may be inferred that it was then the policy, or rather that there was no purpose not to allow the issuing of small notes at that time, yet there is nothing which can be fairly construed as a contract on the part of the State not to change *460 the policy, and afterwards prohibit their issue and circulation. There is no pledge to this 'effect. Nothing is said about the size of the notes to be issued. There are, in this respect, no words but those of ordinary legislation, subject to be modified at any time that it might be deemed expedient. There are no words of contract used, and, in fact, no words which, by the utmost ingenuity and straining, can be made to imply a contract on the part of the Legislature that it will not at any future time regulate the currency, so as to prohibit the issuing and circulation of small notes. The persons who subscribed for stock in this bank had no right to suppose that the Legislature had tied its hands in this particular. On the contrary, in view of the act of 1830, and the restraining clauses in the charters of the other banks, they had every reason to believe that this restraint would be made by a general law on the subject. So, in my opinion, there is not only no objection on constitutional grounds, but no hardship in the case.
The only objection that can be urged to this conclusion, at all plausible, is, if the Legislature can prevent the issue and circulation of one dollar bills, the same may be done in regard to fives, tens, twenties, &c., so that by the abuse of the power, the bank may be restrained from issuing any notes whatever. That is true; but the same objection may be made to the exercise of any power; and it is a full reply to say, the Court can only declare a statute void where there is a want of power in the Legislature,. In reference to questions of expediency or abuse of power, there is no jurisdiction.
3. What has been already said makes it unnecessary to add much upon the third head. Any one will say at once, if the Legislature had the power to revoke the authority conferred by this charter, the intention to exercise it is manifest from all of the circumstances; because, if this bank could issue small notes, it made the restraints put on other banks of no use, and defeated the whole purpose. The charter was granted ut the session of 1848. At the next session an act was passed to amend the charter. It provides, “ it shall and may be lawful for the corporation, &c., to issue notes of the de *461 nomination of three dollars, but no note shall be issued by said bank for a less sum than three dollars.” This was an attempt to remedy the “ oversightand the amount of it is, there being a doubt whether the bank can issue any note under five dollars by force of the act of 1830, it is proposed, as a compromise, to allow the bank to issue notes of the denomination of three dollars and upwards, provided it will agree to issue no notes under that denomination. This proposition was rejected by the bank. At the session of 1851, the act under consideration was passed as a part of the Revised Code, to go into effect 1st of January, 1856. The general purpose of this act is to regulate the currency by prohibiting the circulation of small notes; and to this end it was necessary to prohibit the issuing of such notes; so, the particular purpose was to revoke the authority to issue them, should it have been conferred upon the bank, unless it was conferred plainly and expressly by the charter ; if not so conferred, a penalty was imposed upon the bank for issuing such notes; any person passing or receiving them was subjected to indictment, and the public treasurer was directed not to receive them in payment of taxes ; thus evincing a determination to effect the purpose, if it could be done.
The question then, is, do the words used express this intention with sufficient clearness? in other words, is the bank plainly and expressly allowed by its charter to issue such notes ? "We are .not at liberty tojconsider the word “ expressly” as used in the sense of m toüdem verbis ; for in another section of the same act, it is enacted, “no person or corporation, unless the same shall be expressly allowed by law, shall issue any bill, note, &c.; and taken in that sense, this would apply to all of the banks ; but the charters of these banks all contain a clause expressly prohibiting the issue of notes under a certain denomination ; this express prohibition is taken to give the right to issue notes above that denomination, by reversing the maxim ewpressio wnius exckisio alt&ri/as. A good rule works both ways; and in this latter sense the other banks are expressly allowed to issue notes, whereas this bank *462 is not expressly allowed to do so, in either sense of the word; but the addition of the word “plainly ” removes all doubt. After making so long an argument under the first head to prove that this bank had authority to issue such notes, it certainly cannot be necessary to make another long argument to prove that the authority is not plainly and expressly given.